## THE PEOPLE *vs.* HUBBARD.

A sheriff may be lawfully resisted in carrying away property from a house, the outer door of which being shut, he *opened* for the purpose of entering to make a levy by virtue of an execution against the property of the tenant. The distinction in the books that the sheriff in such case is protected as to the *levy*, but liable as a trespasser for the *entry*, denied.

THE defendant was indicted and tried in the Oneida general sessions for an assault and battery committed on the sheriff of Oneida while engaged in the execution of his office. The sheriff held a *fi. fa.* against Schuyler Hub-bard and four other persons, which had been issued on a judgment for dam-ages and costs, in an action for a joint *tort.* After having made a levy on the property of Hubbard and the other defendants, to a sufficient amount, the sheriff deemed it his duty as between the defendants to increase his levy upon S. Hubbard, and proceeded to his house for that purpose. S. Hub-bard forbade the sheriff entering his house. The door of the house being shut, the sheriff opened it, entered the house, and levied upon a clock, and whilst removing it from the house, S. Hubbard endeavored to pre-[ \*370 ] vent \*him ; and at his request, the defendant, *Russell Hubbard,* a brother of S. Hubbard, came to his assistance, seized the sheriff by the arm, and threw him upon the floor. The sheriff, however, succeeded in carrying off the clock.

The court charged the jury, among other things, that although the sheriff had no right to enter Hubbard's house as he did, and although Hubbard had a right to put him out, and to command assistance for that purpose, still, if after entering he made a levy, that levy would be valid for his protection, and he had a right to carry out the article levied on ; and the *defendant,* by S. Hubbard's command, interfered to hinder his so doing, it was the offence charged in the indictment.

The defendant excepted to the charge, and the jury found a verdict of guilty. Whereupon judgment was suspended by the general sessions to obtain the advice of this court, and the indictment and bill of exceptions were accordingly removed here by certiorari.

*C. P. Kirkland & J. C. Baker,* (district attorney), for the people.

*C. Tracy,* for the defendant.

*By the Court,* COWEN, J. It is not at all surprising that the general sessions gave the direction to the jury which was given in this case. The surprize would have been at a direction the other way ; for the English books of practice abound with the distinction, that though the sheriff having a *fi. fa.* be a trespasser in breaking the outer door of the debtor's house, yet when he is once in the house, though he entered illegally, and for the purpose of taking the debtor's goods, and though he would be liable to an action of trespass for the entry, yet the levy is lawful. It follows, if that be the law, that though he may be resisted in his entry, and even put out of doors by force, yet if he can seize goods, and escape out of doors with them, it then becomes unlawful for the debtor or his assistants to molest him on account of the goods. There is a *dictum* to this effect which has *come down [ *371 ] to us from the *Year Book,* 18 *E.* 4, *fol.* 4, *pl.* 19, which seems to be the sole foundation of the rule. The case in which it occurs, is thus reported : " Catesby came to the bar, and showed how a *fieri facias* was directed to the sheriff of Middlesex, to cause execution to be made for one J. upon a recovery by the said J. against one B.; and afterwards the said B. put all his goods into a chest, closed and locked ; and afterwards the sheriff broke the [outer] door of the house, and entered into the house and took the goods [away] with him, &c. And whether the sheriff had done any wrong, &c. ? *Littleton* and all his companions held that the party might have a writ of trespass against the sheriff for the breaking of the house, notwithstanding the fieri facias ; for the fieri facias shall not excuse him of the breaking of the house, *but of the taking of the goods only.*" Afterward, in *Semayne's case,* 5 *Rep.* 93, the court, speaking of 18 *E.* 4, say, " By *Littleton* and all his companions it was resolved, that the sheriff cannot break the defendant's house by force of a *fieri facias,* but he is a

trespasser by the breaking; and *yet the execution he then doth in the house is good.* In *Lee* v. *Gansel, Cowp.* 1, 6, Lord Mansfield speaks of 18 *E.* 4, as being of an action brought for breaking the outer door, in which the court held the action would lie; but at the same time held that an action would not lie for taking the goods. He adds: " I quote this case not to imply that I should perhaps have been of the same opinion myself in a case of the first impression; but to show that the rule of privilege is taken most rigidly." Much of the reason of Lord Mansfield, in the course of his opinion, goes to countenance the distinction in the Year Book.

Upon such authority, it is not surprising that the distinction should be followed in the books concerning the duties of sheriffs; and yet I cannot find that the point has ever been adjudged till very lately either one way or the other. Upon the question coming before the supreme court of Massachusetts, in an action against the sheriff for breaking an outer door in the execution of an attachment, it received, as it deserved, much consideration: but the sheriff was finally held liable both for the breaking of the [ *372 ] house *and the value of the goods taken. Nearly all the cases bearing upon the point seem to have been cited by counsel, and a learned and elaborate opinion in favor of the plaintiff's entire claim was delivered by Ch. J. Shaw. That opinion was concurred in by the whole court, *Ilsley* v. *Nichols*, 12 *Pick.* 270. The learned chief justice thought it material, as it certainly was, to ascertain whether the point had ever been adjudged, and he concludes that it had not. There is no pretence for saying that it was involved either in *Semayne's case*, or in *Lee* v. *Gansel.* The 18 *E.* 4, seems to have been spoken of however in both, somewhat ambiguously, not to say as directly involving the question; and it would be arrogant to deny that *Coke* and *Mansfield* understood the force of cases in the year books much better than any one at this day. I have examined the case, and given nearly a literal translation of it. It is quite obvious that the main stress of the controversy was whether an action would lie for the breaking and entry. Lord Mansfield himself, we have seen, considers the action as one for breaking the outer door. To this particular action the court say, " The fieri facias shall not excuse him of the breaking of the house; *but of the taking of the goods only.* The latter clause contains every word of what the court are represented in the book to have said concerning the taking of the goods. Chief Justice Shaw says, " On a reference to the case in the Year Book, 18 *E.* 4, *fol.* 4, which is usually cited as the foundation of the supposed rule, we think it is quite manifest that the real point decided there was, that a sheriff is not justified in breaking a dwelling house in order to execute a fieri facias, for a fieri facias will not excuse an officer for breaking a dwelling house." Of course he is clear that the cases in *Coke* and *Cowper* did not turn upon the rule in question. The

language of the late Ch. J. Parsons to the same effect with the Year Book, in *Widgery* v. *Haskell*, 5 *Mass. R.* 155, is also mentioned by Chief Justice Shaw as a *dictum* not based upon serious reflection. Finding himself thus entirely unembarrassed by any direct adjudication, he enters into a course of examination in the region of principle, analogy and the decisions in like cases, *through which an attempt to follow him would    [ *373 ] be entirely supererogatory. I have adverted to the only authorities which can be relied on as controlling, merely with a view to satisfy my. self of their force as positive evidence of the common law. They all go back to the Year Book, in which it is at least very difficult to see that the point arose. All that was said upon it there rather appears to have been a hasty suggestion upon a collateral matter. Lord *Mansfield* is unwilling to admit that he should have so decided; and the report of Lord *Coke* is a mere recital of the case. I think Ch. J. Shaw has satisfactorily shown that here is but a union of mighty names in the extrajudicial assertion of a doctrine which can stand the test neither of principle nor authority. Ad. mitting the distinction to have been directly adjudged in the Year Book and since acquiesced in, there is so much in .conflict with it, that we might overrule it without a violation of duty. How would the book then stand upon its face ? It admitted what is held by all the other cases, and is un-doubted law, that the sheriff had been guilty of a criminal wrong; but as-serted that thereby he had acquired a right. It conceded the privilege of protection to the goods, and to the man and his family, yet offered a reward for the violation of that privilege. It legalized resistance against the sher-iff's entry even to the shedding of blood; but invited the combat by offer-ing him the spoils within. The law has always proclaimed by a pompous figure that a man's dwelling house is his castle ; and promised to defend it as inviolable. The Year Book began in that spirit ; but immediately raised a countervailing influence which broke down its own defences. Lord *Mans-field* declared in *Lee* v. *Gansel,* that the privilege was founded in a sound maxim of policy. But it is, he says, a maxim of political justice, and makes no part of the privilege of the debtor himself, and he then cites the Year Book, to show that it is annexed to the door. In other words, this sound maxim is very little, if any thing, more than a legal abstraction. On reading his whole opinion, it will be found that he was dissatisfied with the privilege itself ; but finding it well settled, he construes it in the light of the Year Book, *so very strictly as to leave it no    [ *374 ] more than a shadow. In short, if the privilege itself exists, the clause upon which he relied cannot be law. It is idle and absurd to talk of the privilege, unless it be enforced by adequate sanctions.

It is well known that Lord Mansfield was no friend to that sort of privilege

which obstructed the collection of debts. In this he was doubtless right. But he was more legitimately employed as a legislator in the house of lords, where he advocated the bill for curtailing it, than in narrowing it as a judge. Perhaps the privilege now in question should be repealed by the legislature ; but we have no power to repeal it judicially, as I am sure we should virtually do by following the distinction allowed by the court below. We are of opinion that they erred in this respect.

Several other exceptions were taken upon which we felt no doubt, and we should have affirmed the proceeding at once on the close of the argument, had it not been for the question of privilege.

The proceedings are remitted, with directions that the court below proceed to a new trial.